May it please the Court and Counsel, my name is Daniel Harden and I represent Defendant Appellant Donna Holevoet. This appeal arises from a bench trial on a breach of contract claim. There was essentially a billing dispute. Action was brought by Landmark Engineering to collect on an unpaid bill. Ms. Holevoet's position at the trial was that she never entered into a binding contract. The trial judge entered judgment in favor of Landmark, presumably finding there was an enforceable oral contract. We've raised two issues in our briefs. I'd like to focus on the first argument, which is whether the court erred by finding a binding oral contract. The second issue deals with damages stemming from the breach of that alleged contract. And while I'm happy to take any questions you may have on that issue, we feel our brief demonstrates that the evidence at trial was unequivocal that the judge entered damages in an amount greater than what the plaintiff testified Ms. Holevoet owned. But I don't think the court will need to address the damages issue because on the oral contract issue the record shows that the trial court's ruling there was an enforceable oral contract was against the manifest weight of the evidence. Why is that? The evidence in the record, based on the conduct of the parties, the written agreements that they exchanged, demonstrates that they wouldn't intend to have a binding oral contract. The parties were using written contracts that Landmark drafted. One was submitted to Ms. Holevoet after the time that Landmark alleges an oral contract was formed, and she refused to execute that contract and did not sign it. We think that that means that there was no meeting of the minds to form an enforceable oral contract. Well, didn't the original contract say that any amendments to this contract must be in writing? That's correct, Your Honor. Signed by the parties. That's correct, Your Honor. And, you know, Landmark has, they drafted that provision in their contract. Now they're trying to disclaim it and say that they can proceed under an oral contract relating to the same subject matter. And we think that that's very important in terms of showing the intent of the parties. The intent of the parties, whether they need a written contract to have a binding contract or an oral contract, the best indication of the party's intent is the language they use in the written agreement. And that language that you just mentioned, Your Honor, is determinative of the issue. The evidence of trial shows that Ms. Holvoth and her sister wanted to sell a parcel of land. And in connection with that sale, they wanted to do an easement and preliminary platting. They hired the plaintiff, Landmark Engineering. The original contract that was executed by the parties, and it's undisputed that that contract was executed by both parties in writing, set out some tasks for Landmark to perform. And those would be preliminary plat design and site plans, and then submit those documents for the development to Henry County for approval. Now, the oral contract contains some important terms that were incorporated in the general conditions, which was a separate document but incorporated into that. As Justice Schmitt mentioned, it said no amendments or modifications unless it's in writing signed by both parties. It also states that the written document will supersede any prior oral negotiations, agreements, or promises. And it also says that there's to be no changes to the original scope of the work without adjusting certain contract terms first. Now, during the performance of the work under the original contract, Landmark's president, Michael Shamsy, essentially decided that instead of doing these documents in a preliminary form, it would be best to do them in a final form and submit them to Henry County for final approval. And to do the final form, he says that there was a July 22nd phone call between the parties where doing this additional work was discussed. Now, it's disputed what happened in that phone call. Shamsy testified that he discussed additional work and Ms. Holdo orally authorized it. Both Ms. Holdo and her sister, who were parties to that phone call, denied that they orally authorized the work. Obviously, that is a finding that the trial judge could resolve in terms of a factual dispute, but it's not determinative of the issue of whether there's a binding contract. And it's because of the undisputed facts that occurred after that phone call. During that phone call, Shamsy said that he would send a written document to Holdo regarding the additional work, and he did so, which is a written addendum. It's undisputed that Ms. Holdo received that written addendum and refused to execute it. Landmark never followed up to see whether she would sign the agreement. Instead, Landmark just charged ahead performing this additional work. Ms. Holdo first learned of it when she received a bill for over $24,000, which was greatly in excess of what she'd agreed to under the original contract. She immediately objected and directed that any additional work on the project be stopped. Would the preliminary plan and site plans, if that was all that was done, would that have accomplished the goal of providing a permanent easement for the ingress and egress, which is really what they wanted in the 60-acre portion? Would that have been enough to get that done? I think so, Your Honor. The goal was to make sure that there would be an easement when the residential zone portion of the land was sold. The sisters testified that that was their primary goal. They weren't looking to get a subdevelopment made in Henry County with this land. Their goal was just to get the easement, get some of the preliminary work done, in case in the future they did want to sell the land to a developer. But the preliminary wouldn't have provided them with or would have with the guarantee of the easement. The easement, I think, more had to do with the surveying work that was part of the original contract as well. There were two components of the original contract. Well, there were more than two, but in terms of what Landmark was doing, one was to do some surveying work to trace out those easements, and then the other part of it was to do preliminary site design, preliminary stormwater, and environmental designs on the contract as well. Yeah, the sisters' goal would have been accomplished just from the preliminary plat. I don't believe they needed the final plat to do what they needed to accomplish. Now, returning to the sequence of events, the fact that Landmark submitted this written contract to the additional work and it was not signed is the key determinative fact in this case. Because Illinois law is clear, even when there is an oral agreement, if the parties submit a written contract on that subject matter, it can show they don't intend to form a binding contract until the written contract is executed. And that's the series case decided by the Illinois Supreme Court. I list a number of factors to consider. Before we address the factors, I would like to just address the purpose of this doctrine in the series case. It's not to let a party out of an oral agreement that it's made. It's not to let people wiggle out of contracts. Instead, it's a recognition that parties, when they're orally negotiating a contract, can reach a tentative agreement but know that they need to put that agreement in writing, whether it be to add some additional ancillary terms, a need to review specific language, or a need to just have it in writing based on the subject matter and amount of money involved. Well, in plain English, it's to protect both sides from he said, she said, as to what was the agreement. That's right, Your Honor. The whole doctrine of oral contracts, one reason that Illinois courts require unequivocal evidence of an oral contract is to prevent that kind of issue, to prevent sort of the he said, she said issues and holding a party to a contract when there's just these oral exchange of information. And so the doctrine in series basically says, you can't hold a party to these oral agreements when they're going to intend to rely on a written contract unless the written document is simply agreed that it's going to memorialize the oral agreement. And there was nothing like that in this case. There's no e-mail from Landmark to Ms. Holdo saying, here's the written addendum. This confirms what we discussed earlier. This is a memorialization of our oral agreement. Instead, they sent this written addendum to her with the prior contract saying that any amendments need to be in writing. And the written addendum was sent to her with a signature block, and the only reasonable inference from that is that Landmark intended for Ms. Holdo to execute the contract and return it to Landmark. Regarding the- What happened after your client told them to stop? After she directed Landmark to stop, they did actually perform additional work on the file. Mr. Shancy testified that he thought it would be best just to go the rest of the way with the final approval. In a contract, I don't know that that's a decision that you can make unilaterally. If you're directed to stop, you have to stop, mitigate your damages if there are any. So I think that fact just shows that there was an aspect to this contract of just running up a large bill. If you look at the estimates provided by Landmark to do this work, their estimate was $15,000 for the original. The written addendum that was submitted was an estimate of $12,000. They ended up racking up close to a $64,000 bill. To the sense that, you know, there are equitable considerations involved in this case, we think that also weighs in Ms. Holdo's favor, although it's not really an issue in determining whether they formed a contract. Whether they formed a contract deals with the written documents they exchanged and the conduct of the parties. Thank you. There's a number of factors that the serious court sets forth to analyze this issue. I would just like to focus on the last one, which is you look at the conduct of the parties after the contract is executed. Landmark has argued that Ms. Holdo didn't respond specifically rejecting the written addendum. But under Illinois law, they don't have to. The All-American Roofing case that we cited in our opening brief gives a really great summary of Illinois law regarding where parties are bound to an oral agreement, even though they don't execute a written contract on the same subject matter. And what the All-American Roofing Court said is the rule in Illinois is a party is bound, even when they don't sign a written contract, not only when they fail to object to the contract, but it also requires that they take affirmative actions consistent with the contract's terms, indicating an intent to be bound. So the fact that she didn't object is not enough. And here Holdo, none of her post-telephone conversation conduct showed she affirmatively accepted the contract or did anything consistent with its terms. She did not perform any services required under the contract. She was not communicating with Landmark, encouraging them to perform this additional work. And she didn't knowingly accept the benefits of this additional contract. Ms. Holdo didn't know that this work was being performed on the additional contract. Landmark was sending her documents, but they never specifically said, this is a piece of work performed on the written addendum contract. They would just submit something that says, here is the site design, here is the stormwater. So it's reasonable for her to assume that these documents are produced under the original contract and not the unsigned addendum. How much work had been done in July? At that time, I believe, Your Honor, that they had finished the work on the preliminary plat, but it had not yet been delivered. Nothing had yet been delivered at that time. Why would, if that's all she agreed for them to do, and they were sending her other e-mails and saying, we've done this, we've done this, we've done this, if the work had been done and she hadn't agreed to any more, wouldn't that raise a red flag of, you shouldn't be doing anything because I haven't agreed to anything more? Well, at the time of the July 22 phone conference, Ms. Hovold didn't have the, they were referring to what needed to be produced under the contract as the deliverables. She had not received any of that yet. So when these documents were submitted to her subsequent to that phone call, it was her assumption that they were produced under the original contract, and they were just giving her the deliverables called for under the original contract. Which would have just been some type of a finished document, you mean a copy of the preliminary plat? That's correct, Your Honor. But didn't she say that there were some e-mails that were being sent that were talking about work that was being done? Not until she learned that Landmark had done this additional work when she received the bill. At that point she directed that they stop this additional work. The reason she thought that was because the original contract called for an estimate of $15,000. She received the bill for almost $25,000. How was that communicated to stop? She sent an e-mail directing that they stop all work. Was that what initiated the e-mails? She had received some prior e-mails when Landmark was transmitting some documents to her, and those were the documents she thought were the deliverables under the original contract. Thank you, Your Honors. Good morning, Your Honors. Please be seated. My name is Mike Dielfner. I represent the plaintiff, Dr. Lee, in this case. Our contention, first off, is that the case upon which the appellant relies, the serious case, the issue in that case as to whether or not you needed an executed and delivered formal written agreement in order for the oral agreement that we contend we've proved at the trial level to be binding and enforceable was never raised at the trial level. Well, let me ask you this. It was raised. Who provided the original contract? Landmark did. Okay. Your client. And that contract says, this contract may not be amended, altered, or modified except in writing signed by all parties, correct? That's correct. And then there was some kind of discussion over the phone. Okay. And then your client prepared a written addendum for the appellant to sign. The appellant didn't sign it. Why isn't that game set match? Wasn't a proper thing for your client to do to say, hey, I sent you that addendum. If you want us to do anything, if you want us to proceed, you need to sign it and return it. What Mr. Shanzy, who was president of Landmark, testified to was that he had that discussion with the defendant and her sister in order to inform them that in order to complete the preliminary plan, there were issues that arose that were separate and apart from the scope of services that were set out in the written contract. Our contention and argument at the trial level was that the additional work was not part of the original scope of services. It was a separate oral agreement. Well, your client themselves referred to it as an addendum to the contract when they sent it back to them, right? I mean, this is lost contracts 101. And I don't understand how And it's your client that also wanted to be protected and put it in the contract also to protect itself from a he said, she said situation. Oh, well, she got it testified. Well, they said they'd do all this work for $6,000 or whatever. These provisions protect both parties in some respects in that kind of thing. But the fact is, I mean, I just don't understand. You explain to me how you get by your contract that says no changes are going to be made unless in writing and signed by all parties. What I'd like to do is provide you with some factual background as to what it was kind of like a bang bang situation. What all of that and her sister testified to was they didn't want to complete the sale of the land until they got the preliminary survey, the plan of survey right. In order to get that Mr. Shamsi and Landmark kept attempting to get it from the proper governmental authorities and county authorities. And every time they did, a new obstacle would come up. So they couldn't come up with the final product of the preliminary plan, which testified that they wanted in order to be able to sell to a developer if the need arose. Well, fine. I understand that. But they could have clearly protected themselves by saying, hey, by the way, I know we told you it was going to be $15,000, but it's going to be another $50,000 on top of that. And because of that, you need to sign this or we're not doing any more work. Your Honor, what Mr. Shamsi also testified to in that conversation of July 22, 2008, he explained and got verbal authorization for Landmark to be able to do the additional work separate and apart from the scope of services. He also testified he explained to Ms. Holbrook and her sister that this was not part of the scope of services in the original contract. He also testified that he indicated to them that there would be additional costs associated with doing the work, the additional work that was not part of the scope of original services. When he obtained verbal authorization because the closing of the parcel had been continued twice over and he had been getting pressure from Ms. Holbrook to get this done so they could close that deal, he went ahead and performed the work based on her verbal authorization. That's why our argument from the very beginning at the trial level was that there were two contracts, a verbal one and a written one, the written one being the original contract. Was the work done pursuant to this verbal contract you're talking about, the same work that was outlined in this addendum that you sent? No, Your Honor. It was not. It was totally different work because when Mr. Shamsi testified at the trial level he explained to the court that what would occur a lot of times is you go in and every time you go in, either a county body, a county board body, or a highway body, or a planning and utilities body would tell them, well, we can't approve your preliminary plan unless you do this, this, and this, which is never set out in the original scope. That's the nature of the way that the preliminary plans were done and that's how Mr. Shamsi testified that that occurred in almost any preliminary plan survey that he had to prepare where he had to deal with these governing bodies. That's why he had to have a conference call with Ms. Huddleworth and her sister. That's the way he testified about it and apparently the trial court believed his testimony over the statements of Ms. Huddleworth and her sister. Our contention with respect to the application of the serious case is that setting everything aside, the trial court had the opportunity to listen to both witnesses, to listen to everything they had to say, all the witnesses involved, and based upon that, had to make a judgment call as to which of the witnesses were credible. Let me understand this. There was the original written contract. Yes. And there was an agreement between the two sisters and your client. Yes. And that written contract set out what the job was, what they were supposed to do, correct? That's correct. Okay. Did they complete that first contract? They went as far as they could without having to do the additional work, is what Mr. Shanty testified to. That's why he had to have the conversation with both Ms. Huddleworth and her sister in order to tell them, I can't get you the preliminary plan, they couldn't finish unless they did the additional work. So they never finished, they didn't finish before this conversation with the sisters, they didn't finish the first contract, Mr. Shanty. They completed as much work as they could. But they didn't complete it. They couldn't complete the preliminary plan because they needed to get authorization to do the work that the governing bodies needed them to do in order to approve the preliminary plan. That's where they were running into problems, is getting approval in the preliminary plan. So under your view, they talked to the sisters because they couldn't complete the original contract. They couldn't get approval in the preliminary plan. That was the last step, but they couldn't get that completed without doing more of the requirements. Which was part of the original agreement. Yeah, getting it approved. Getting the preliminary plan completed, yes. And so then the additional that you say is the separate contract, the oral print contract, is it part of the first and then some other stuff? It was completely separate with respect, at least our argument and our evidence that we presented, was completely separate from the scope of services set out in the written agreement. That's why you called them to get the approval. But it was necessary to fulfill the original contract, in other words, get that place planned. Mr. Shad, you've justified that at certain times, during the preliminary process, you do not know at certain points whether you'll be able to complete it until you've satisfied the government agencies, county board, utilities. The question is, this extra work had to be done in order to complete what was intended to be completed in the original contract. In other words, they couldn't get done what they thought they could get done in that original contract without doing this additional work. Yes. So where is he already obligated then to do the additional work that's finished? Mr. Shad's decision was that the scope of services was not the same. In order to complete it, he had to get authorization to do the additional work, which is why he arranged for the teleconference call. If they had told him they wouldn't approve the additional work at that time, he would have just let it go. They approved it according to his testimony in the conversation to do it. Well, if he just let it go, would that have reached the first contract? Only in part, because the first contract was two parts. The first part was to do a survey on the northern 60 acres in order to sell his agricultural land, and the second part was to put in an impact on the southern 40 acres so as to enhance its value for possible sale to real estate developers. So the first part was done. I'm trying to get my head around this. You know, when I'm looking at all the facts and the arguments with regard to, well, now it appears that they're interrelated and separate yet the same, I guess. They're somehow connected. Yeah, somehow they're separate and yet they're the same, too. Because the professional who drafted this contract got an agreement with the sisters to get this done and evidently was not able to complete that first contract, which would have been perhaps a breach of that first contract, of what they said they were going to do or not. So to save them, you know, to complete it, they were going to have to do what you say is a separate oral agreement to do this extra work. But they have to do this extra work to be able to accomplish what they were supposed to accomplish in the first contract, right? To some extent, yes, because what Mr. Shanzy testified to is there are certain times when they wouldn't have to do the additional work dependent on where you were doing the plot and which government agency. They, in a sense, underbid the first contract? It's still a bid. It was an estimate. It wasn't a ceiling or a cap. This was their estimate of what it would cost. But it was a contract. Correct. So it wasn't an estimate. They say we're going to do this, correct some out. Well, it was an estimate on a time and material basis. So I have a question about that. The things that are outlined that they are going to provide, and then those things would be a package that would be this preliminary plan. So if they deliver it and they do the things that are there, but they still don't get approval, then is it because of that that they said, now the zoning committee of Henry County says this isn't going to apply and you've got to do X, Y, Z, whatever, and so even though you don't reach because you've done what is here, it still wouldn't get them what they want. Correct. So is that why this phone call happened? Yes. So they had completed? They had completed the survey but not gotten the approval of the requisite governmental authorities in order to be able to present it to a prospective developer and say, here it is. It's approved. We're going to sell this to you for X amount of dollars because all of the approval has already been obtained. You don't have to do the preliminary plan yourselves. You don't have to get the permits and so forth to build on this, to subdivide, create ingress and egress and all of that because it's already been done. And it was your client's understanding that there was a contract for the sale of this property? There was a contract for the sale of the property from the get-go. The 60 acres was to be sold as agricultural land and then the 40 acres was what they hoped to get a preliminary plan for in order to enhance its value for sale to a developer if necessary. In fact, if my recollection is correct, they sold the first 60 separate from the fourth. I'm not sure if there were two separate deals, but that's also why Ms. Volvo was questioning the delivery of what she called deliverables, which she did receive from Landmark, but testified she never looked at it. She directly forwarded it over to her real estate attorney but never even looked at it. She didn't look at any of the emails. She got it and just let go. For someone who was eager to get the deal done, I submit that you could at least look at it or call your real estate attorney and say, is this everything? What does this mean? What does that mean? She never bothered until she got the bill. She got the invoice for all the completed work and then she sent a cease all work message to Landmark. And contrary to what counsel for Ms. Volvo said, they did stop work. Part of the confusion is that their invoicing system covers past. It might be dated in after September, but it covers work prior to it. It's just a weird way that their accounting system works. As far as I'm aware, they stopped work when they got the notice from her. Let me ask you this real quick. Okay, so after this July conversation, your client does prepare an addendum and sends it to the tenant. And then you say that this work, and that had a figure of an additional $12,000. I believe it was more than that. And so then you're saying why, if that addendum didn't encompass what it was presumed at that conversation to be what needed to be done to solve everybody's goals, what was the purpose of sending that addendum if it wasn't saying, okay, here's what needs to be done in addition to what we've previously talked about? If I recall Mr. Shange's testimony accurately, it was he discussed a number of additional work items that were to be done. I think it was his intent to memorialize those items because he was talking to Ms. Ovett and he just wanted to be sure that she understood what was to be done. Or that's my recollection of what he testified about. What she actually understood obviously is not the same thing. And then are you saying in addition to the work outlined in that addendum, that there was also additional work? No, that was it. That was what he said he testified was discussed in the July 22, 2008 conversation. That a conference call was all set out in that addendum. He testified, he explained to her why it was necessary and what was to be done. Counselor, your time is up. Thank you. Would you say the addendum reflected what your client alleges is the oral agreement? Yes. It set out everything he had discussed with Ms. Ovett. And if that's the case, then how did the amount claimed at trial was much more than the amount that the addendum was? I think it was a combined amount of the original contract plus the addendum. There's exhibits in the record that set out specifically how much each invoice was and for what. Am I correct? I thought the amount at the end of the day was more than the combined amounts on the original contract. Yes, it was. But as I stated, the original amount was an estimate based on the time and material. It just grew. It just grew. I don't know what else to say. I need Mr. Shanty to justify that he explained that it was not capped to the amount originally estimated. Thank you. Mr. Harden. Thank you, Your Honors. I'd like to address the idea that the oral contract, this alleged oral contract for work that's set out in the written addendum, is somehow separate subject matter. I don't think that that comports with any of the documents or the facts in the case. All the addendum was doing was changing the scope of certain work from preliminary to final. Instead of a preliminary storm sewer design, they were going to do a final storm sewer design. Instead of a preliminary plat, they were going to do the final plat and get that approved by Henry County. That's just changing the scope of preexisting work. It's not creating a whole new contract on separate subject matter. Therefore, it isn't just an amendment to the original contract. An oral amendment is prohibited under the terms of the original contract, and that's just why it's not enforceable here. In a sense, the opponent doesn't appear to disagree with that statement, because they say that the oral contract, from their standpoint, it was separate things that had to be done beyond the first contract that they determined had to be done once they start trying to get approvals and so forth of this other stuff. To accomplish the goal of the first contract, you had to do this extra work, this additional work. Isn't that what they're saying? I think that's what counsel just stated. Yes, and then if that's the case, then it is just an amendment to the original contract. It's not a freestanding contract in any way that wouldn't implicate the restrictions that the parties put on themselves in the original contract. It appears to me that what they're saying is that the original contract and what was set out in the original contract would not accomplish the ultimate goals that were meant to be accomplished in the original contract. So therefore, the oral contract had to set this other stuff that was written out, that was set forth in the addendum, but based upon what the oral agreement was. I think that sounds right, Your Honor. I'm not positive, and I don't want to misrepresent counsel's argument. I mean, I would just say that the amendment, whether it's oral or written, is going to modify the original contract. The intent of the parties was that could not be done orally, and that's why there's no enforceable contract to do this additional work. Second point, just as far as whether the written addendum served as just a memorialization, again, the record doesn't show any testimony that that's why that document was submitted. And if you just look at the face of the document itself, it doesn't say anything like that, and it has signature blocks. I mean, the reasonable inference there is that it's intended to be executed to be binding. Finally, counsel mentioned his waiver argument. The intent of the parties and whether they intended to be bound by an oral contract was raised below. We did argue that there was no meeting of the minds because she refused to execute this written addendum, and the original contract said that amendments have to be in writing. Therefore, whether there's a meeting of the minds, it's a matter of the party's intent, and whether they intended to be bound by an oral contract is a matter of the party's intent. That was clearly raised and argued below. In the timeline of this matter, the written addendum was provided after the alleged oral conversation, correct? That's correct, Your Honor. So there's a July 22 phone conversation where Mr. Shamsie says he gets verbal authorization to proceed, but there is testimony that he also said he would send the written addendum to the parties, and it's after that phone conversation that it is submitted. Then the submission of the written addendum. And then he was informed that they're not going to sign that, right? Or she refused to sign it. Yes, she did not sign it. The record doesn't clearly show that she informed Landmark that she was refusing to sign the contract. She just refused to sign it. She just refused to sign it. That's correct. He never received an executed written addendum, but he went on to perform this work anyway. Was there a real estate sale pending at the time this was going on? There was a sale of the agricultural portion of this parcel, so I believe the top 60 was zoned agricultural, bottom 40 were zoned residential. There was a sale pending, and the documents were being sent to Ms. Holowot's real estate attorney. So the documents that came between the 22nd of July, September, those went straight to the real estate attorney. They went to her. She forwards them. That's my understanding, yes, Your Honor. So they were only impacting the sale of 60 acres, or was there any contract or contingency on the 40 acres? To be honest, Your Honor, the record doesn't show whether there is a contingency on that, so I really can't answer that question. Thank you. Thank you, Mr. Hardy. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible.